UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

MARIA PENA, as the Administrator of the Estate of DILCIA PENA, and MARIA PENA, individually,

Docket No.: CV 02 3147

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 29 2002 ★
BROOKLYN OFFICE

Plaintiff,

VERIFIED COMPLAINT

-against-

DN 57

GERSHON, J.

AZRACK, J.

THE CITY OF NEW YORK (CITY); THE PATROLMAN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK (PBA); individually and in their official capacity as NEW YORK CITY POLICE OFFICERS, JOSEPH GREY, SERGEANT DENNIS HEALY, SERGEANT KEITH SINGER, CAPTAIN THOMAS DEPRISCO, CAPTAIN ROY RICHTER, LIEUTENANT RICK CARPEN, SERGEANT PETER MOY, SERGEANT MICHAEL ZARILLI, POLICE OFFICER JACK CONWAY, POLICE OFFICER JOHN WELSH, POLICE OFFICER EDWARD SILLS, POLICE OFFICER ANTHONY PRINZANO, POLICE OFFICER MICHAEL GAUDIO, POLICE OFFICER MARIE DESARIO, POLICE OFFICER PAUL ALBA, POLICE OFFICER JOHN CHAVEZ, POLICE OFFICER MICHAEL McGILL, CAPTAIN BRIAN WHITE, POLICE OFFICER MARTIN FINKELSTEIN; in his official capacity as President of the PBA, PATRICK LYNCH, individually and in their official capacity as New York City Police Officers, and in their official capacity as agents of the PBA - MICHAEL IMMETT, "JOHN" RABINOWITZ (first name being fictitious and presently unknown), "JOHN" GALLO (first name being fictitious and presently unknown); individually and in their official capacity, "JOHN DOE", Police Officers and non-uniformed employees of the New York City Police Department, the identity and number of whom is presently unknown; individually and in their official capacity as New York City Police Officers "RICHARD ROES", Supervisory Police Officers of the City of New York, the identity and number of whom is presently unknown; individually and in their official capacity as Police Officers and/or agents for the PBA - "WILLIAM WOES", agents for the PBA, the identity and number of whom is presently unknown; and THE WILD WILD WEST, INC.,

Defendants.

-----------------------------------------------------------------X

MARIA PENA, individually and as administrator of the estate of DILCIA PENA, by and through her attorneys, THE COCHRAN FIRM, SCHNEIDER, KLEINICK, WEITZ & DAMASHEK, states as follows:

## INTRODUCTION

1. This action arises from one of the most egregious acts of police misconduct and supervisory neglect in the history of New York City, and the conspiracy to cover it up.

2. It seeks compensation for the unconstitutional and tortious conduct of police officers who after being informed about JOSEPH GREY's drinking problem, did the following: (1) hired him onto the police force; (2) failed to train him discipline him, educate him or treat him regarding his alcohol problems; (3) encouraged him to drink while on and off duty; (4) turned a blind eye to him when he was drinking to excess while on and off duty; (5) encouraged him to drive while intoxicated and (6) after the accident of August 4, 2001, for which JOSEPH GREY was ultimately convicted of criminally causing the death of four individuals by driving while drunk, attempted to cover-up his criminal, reckless and negligent conduct by intentionally botching its investigation into the accident, and devising a scheme to hide the truth of what had occurred.

3. In the aftermath of the August 4, 2001 accident, the defendant-officers who witnessed and investigated the criminal acts of public drinking, driving while intoxicated and the violations of New York Police Department polices and practices created a "blue wall of silence" and lies to obstruct justice and prevent the truth from surfacing in this case. Similarly, supervisory police personnel failed to control, discipline, and stop subordinates with a history of alcohol abuse, lawless conduct, and otherwise reckless behavior associated with alcohol use.

Likewise, Ms. Pena seeks redress against the Police Benevolent Association and the City of New York for policies and practices that condoned and encouraged the "code of silence" environment. Such an atmosphere fostered the belief in alcohol-abusing police officers that they were insulated from discipline, investigation, prosecution and conviction for even the most egregious, reckless and criminal acts related to alcohol use. The wrongful death of DILCIA PENA and the concomitant loss of companionship, grief and association felt by MARIA PENA for the deaths of her daughters, DILCIA PENA, MARIA HERRERA, and her grandsons, ANDY HERRERA and RICARDO HERRERA, resulted directly from these defendants' unconstitutional behavior and deliberate indifference.

4. The incidents giving rise to this lawsuit have already subjected some of the officers involved to termination of employment, increased supervision, and the subject of an ongoing criminal investigation. Other culpable individuals and entities, however, have escaped accountability for actions that were unconstitutional, tortious and inhumane.

5. This tragedy began when JOSEPH GREY applied to become a New York City police officer in 1984, and, on his application, alerted the New York Police Department that he had a drinking problem. From that moment until August 4, 2001- - when JOSEPH GREY drove drunk and sped through several red lights, striking and killing DILCIA PENA, MARIA HERRERA, ANDY HERRERA and RICARDO HERRERA - - defendant GREY was never questioned about his alcohol use, counseled on his alcoholism, stopped from driving drunk, or disciplined for drinking on the job.

6. When defendant GREY ended his shift at the 72nd Precinct at about 8:00 A.M. on Saturday, August 4, 2001, he began drinking alcoholic beverages to excess in the parking lot of

the 72nd Precinct with fellow police officers EDWARD SILLS, ANTHONY PRISINZANO, JOHN CONWAY, MICHAEL GAUDIO, MARIE DESARIO, PAUL ALBA, JOHN CHAVEZ, MICHAEL McGILL, and supervisory police sergeants KEITH SINGER and DENNIS HEALY.

7. In this parking lot, while in full view of the public, and precinct supervisors, these officers drank inordinate amounts of alcohol with impunity.

8. Indeed, prior to August 4, 2001, the consumption of alcohol in the 72nd Precinct was a common and accepted practice by police officers, their supervisors, and other employees of the New York Police Department.

9. Moreover, not only were off-duty officers allowed to drink at the precinct, but on-duty officers were permitted to drink as well.

10. In fact, prior to August 4, 2001, one defendant, Police Officer MARIE DESARIO witnessed defendant JOSEPH GREY and her supervisor, defendant SERGEANT KEITH SINGER, drinking while on-duty inside the 72nd Precinct.

11. Far from being disciplined, evaluated for problem-drinking, or even cautioned about his alcohol consumption, defendant JOSEPH GREY was lauded as being a "good cop."

12. Supervisory personnel at the 72nd Precinct condoned and encouraged defendant GREY's lawless behavior by not disciplining him for drinking in public, which is an arrestable offense. Supervisory personnel further condoned and encouraged defendant GREY's lawlessness by drinking with him in public while both on and off duty, and by allowing him to drive in an inebriated condition.

13. In fact, on August 4, 2001, after having witnessed defendant GREY drink excessively in the 72nd Precinct parking lot, GREY's supervisor, defendant SERGEANT HEALY

asked defendant GREY to drive him to a club owned by the defendant WILD WILD WEST INC.

14. While intoxicated by alcohol, defendant GREY on August 4, 2001, at about 12:00 P.M., drove with defendant SERGEANT HEALY as his passenger to the WILD WILD WEST bar and strip club, in complete and utter disregard to the New York Police Department regulation prohibiting officers of the 72nd Precinct from going there.

15. Indeed, prior to August 4, 2001 (the New Ytork Police Department had declared the Wild-Wild-West off limits). Notwithstanding this policy, defendants SERGEANT HEALY, GREY, HILDEBRAND and WELCH and other officers of the 72nd Precinct violated this regulation on multiple occasions with impugnity.

16. At about 4:00 P.M. on August 4, 2001, nearly eight hours after beginning their non-stop, binge-drinking session at the 72nd Precinct parking lot, which continued at the WILD WILD WEST bar, defendant SERGEANT HEALY asked defendant JOSEPH GREY to drive him back to the 72nd Precinct.

17. At around 5:00 P.M., intoxicated defendant JOSEPH GREY dropped off drunken defendant SERGEANT HEALY at the 72nd Precinct so that defendant HEALY could drive himself home.

18. Defendant JOSEPH GREY then entered the 72nd Precinct in full-view of the on-duty desk sergeant PETER MOY, who took no action to prevent defendant GREY from driving while drunk.

19. In fact, neither defendant PETER MOY nor the patrol sergeant at the time, defendant MICHAEL ZARELLI, nor any other police officer or police supervisor, who knew

about the drinking session in the 72nd Precinct parking lot on August 4, 2001, did anything to prevent it from happening, stop it from continuing, or ensure that no one drove out of the parking lot while impaired from alcohol.

20. In any event, after using the 72nd Precinct facilities and coming into contact with on-duty officers of the 72nd Precinct, defendant GREY was allowed to leave the precinct, get into his car and return to the WILD WILD WEST.

21. For the next three-and-half hours, defendant GREY drank alcohol and eventually drove his car while drunk onto Third Avenue.

22. At around 9:00 P.M. on August 4, 2001, defendant GREY, while driving a 1996 Ford Minivan, bearing license plate number X239DD, drove through at least one red light at an excessive rate of speed while drunk, and, without sounding his horn, stopping or braking, struck and caused the wrongful deaths of DILCIA PENA, ANDY HERRERA, MARIA HERRERA, and RICARDO HERRERA.

23. The Patrolmen's Benevolent Association ("PBA") quickly became involved in the conspiracy to cover up their officers' abominable conduct. Consistent with its regular practice in cases of serious misconduct and/or criminal behavior by police officers, the PBA and its agents - - all police officers themselves - - acted affirmatively to prevent guilty parties' from being brought to justice. This role included: helping the individuals involved fabricate a consistent and exculpatory version of what had happened; discouraging witnesses from coming forward and telling investigators what they knew; and disparaging and intimidating those officers who performed their legal and moral duty by disclosing to investigators information regarding this serious, unsolved crime.

24. Moreover, investigating officers from the Police Department's Accident Investigation Squad, intentionally mishandled, lost and/or effectively destroyed evidence from the crime scene that was inconsistent with defendant GREY's innocence.

25. The film from photographs that were taken of the scene was unable to be developed, while socks, shoes and other items of the innocent victims were mysteriously "lost."

26. Defendant OFFICER FINKELSTEIN conferred with defendant PBA official and New York Police Department Officer MICHAEL IMMITT to devise a strategy for covering up defendant GREY's drunken condition, which included allowing a nearly three and one-half to four-hour delay in testing for the presence of alcohol.

27. Other officers who were aware of the misconduct and alcohol abuse in this case stonewalled the investigation by failing to provide truthful answers to investigators' questions. Such conduct has prompted a criminal investigation.

28. Still other police officers attempted to improperly influence civilian witnesses to the accident, such as Rosa Cintron, to change their statements to fit into the untruthful theory of innocence concocted by defendant JOSEPH GREY, the PBA and others.

29. Ultimate responsibility for the horrific events of August 4th and their aftermath rests with the City and the PBA. Together they have jointly encouraged, condoned and maintained the "code of silence" or "blue wall," which has emboldened officers to act on their worst and most lawless inclinations, and which has operated to assure that otherwise honest and law-abiding officers witnesses lie, cover up harmful evidence, or maintain silence about what they know.

30. It is the policy and practice of the New York Police Department not to treat police officers subject to criminal investigations much differently than ordinary citizens.

31. Indeed routine policy of the PBA and its agents - - almost all of whom are New York City Police Officers under an affirmative legal obligation to come forward with evidence of wrongdoing - - to conceal as "privileged" the admissions of misconduct and crimes by fellow officers, only adds brick and mortar to the "wall."

32. The PBA and its agents are not mere passive receptacles of inculpatory information. Instead, in this case and many others, the PBA plays an active, energetic role in ascertaining what happened, with the specific intent of determining what evidence of criminality must and can be hidden from law enforcement authorities, by encouraging officers who are aware of information or evidence that would incriminate others to lie, remain silent, and "hang together."

33. The policies, customs, and practices of the PBA and the City have promoted an atmosphere in which the very worst police officers feel assured that evidence of misdeeds depriving citizens of their civil rights, no matter how awful, will be hidden by PBA representatives and the "code of silence," where dishonesty goes undetected and unpunished, and honesty is actively discouraged. With the imposition of punitive damages against all defendants, with the exception of the City, and of appropriate equitable relief, plaintiffs hope to deter defendants and bring an end to this intolerable cycle of misconduct and silence.

**JURISDICTION**

34. This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988; and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the

laws of the State of New York. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 (1-4), and 2202 . Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367. The matter in controversy exclusive of interest and costs exceeds $100,000.00 (One Hundred Thousand Dollars).

35. Venue is proper in this district under 28 U.S.C. § 1391(b).

**PARTIES**

36. Plaintiff MARIA PENA is a resident of the City of New York, who, prior to the commencement of this action, was duly appointed administrator of the Estate of Dilcia Pena by order of the Surrogate Court of Kings County.

37. Defendant, CITY OF NEW YORK (CITY), is a municipal corporation within the State of New York and the public employer of the police officers and named as defendants in this action.

38. Defendant, The Patrolmen's Benevolent Association of the City of New York (PBA), is the union representing approximately 29,000 New York City police officers. In addition to the customs, policies, and practices discussed herein, the relationship between the PBA and its members on one hand, and the City on the other, is governed by a collective bargaining agreement, and by rules and regulations set forth in a document widely known as the "Patrol Guide."

39. In addition to the facts alleged in the following subparagraphs, the following defendants are all sued in their individual and official capacities, and all acted within the scope of their employment and under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York:

a. Defendant, JOSEPH GREY, at all relevant times, was a police officer employed by the defendant City of New York;

b. Defendant, Captain THOMAS DIPRISCO, at all relevant times, was a police officer employed by the defendant City of New York;

c. Defendant Captain ROY RICHTER, at all relevant times, was a police officer employed by the defendant City of New York;

d. Defendant Lieutenant RICK KARPEN, at all relevant times, was a police officer employed by the defendant City of New York;

e. Defendant Sergeant PETER MOY, at all relevant times, was a police officer employed by the defendant City of New York;

f. Defendant Sergeant MICHAEL ZARILLI, at all relevant times, was a police officer employed by the defendant City of New York;

g. Defendant Sergeant KEITH SINGER, at all relevant times, was a police officer employed by the defendant City of New York;

h. Defendant Sergeant DENNIS HEALY, at all relevant times, was a police officer employed by the defendant City of New York;

i. Defendant JACK CONWAY, at all relevant times, was a police officer employed by the defendant City of New York;

j. Defendant CRAIG HILDEBRAND, at all relevant times, was a police officer employed by the defendant City of New York;

k. Defendant JOHN WELSH, at all relevant times, was a police officer employed by the defendant City of New York;

l. Defendant EDWARD SILLS, at all relevant times, was a police officer employed by the defendant City of New York;

m. Defendant ANTHONY PRINZANO, at all relevant times, was a police officer employed by the defendant City of New York;

n. Defendant MICHAEL GAUDIO, at all relevant times, was a police officer employed by the defendant City of New York;

o. Defendant MARIE DESARIO, at all relevant times, was a police officer employed by the defendant City of New York;

p. Defendant PAUL ALBA, at all relevant times, was a police officer employed by the defendant City of New York;

q. Defendant JOHN CHAVEZ, at all relevant times, was a police officer employed by the defendant City of New York;

r. Defendant MICHAEL McGILL, at all relevant times, was a police officer employed by the defendant City of New York;

s. Defendant MARTIN FINKELSTEIN, at all relevant times, was a police officer employed by the defendant City of New York;

t. Defendant JOHN DOES, at all relevant times, were police officers and non-uniformed police employees of the defendant City of New York, the identity and number of whom is presently unknown;

u. Defendant RICHARD ROES, at all relevant times, were supervisory police personnel of the defendant City of New York, the identity and number of whom is presently unknown;

v. Defendant MICHAEL IMMITT, at all relevant times, was an agent of the PBA

acting under its directives and a police officer employed by the defendant City of New York;

w. Defendant "JOHN" GALLO, first name being fictitious and presently unknown, at all relevant times, was an agent of the PBA acting under its directives and was a police officer employed by defendant City of New York;

x. Defendant WILLIAM WOES, at all relevant times, were agents of the PBA acting under its directives and may have been employees of the defendant City's Police Department, as well, the number and identity of whom is presently unknown;

40. Defendant WILD WILD WEST, INC., was a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York, and at all relevant times did business in the state of New York as owner of the strip club and bar d/b/a Wild Wild West.

41. Plaintiffs in furtherance of their state causes of action, filed timely notice of claim against the City in compliance with General Municipal Law Section 50.

42. More than thirty days have elapsed since service of said notice, and the City has failed to pay or adjust the claim.

43. A 50-H hearing has been held.

44. This action has been commenced within one year and ninety days after the happening of the events upon which these claims arise.

45. That this action falls within one or more of the exceptions set forth in C.P.L.R. 1602.

46. Pursuant to CPLR section 1602 (2) (iv), defendants are jointly and severally liable for all of plaintiff's damages, including but not limited to plaintiff's non-economic loss,

irrespective of the provisions of the CPLR Section 1601, by reason of the fact that defendants owed the plaintiff a non-delegable duty of care.

47. Pursuant to CPLR Section 1602(7), defendants are jointly and severally liable for all of plaintiff's damages, including but not limited to plaintiff's non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that defendants acted with reckless disregard of the safety of others.

48. Pursuant to CPLR Section 1602 (6), defendants are jointly and severally liable for all of plaintiff's damages, including but not limited to plaintiff's non-economic loss, irrespective of the provisions of the CPLR Section 1601, by reason of the fact that defendants should be held liable by reason of defendant GREY's use, ownership or operation of a motor vehicle.

49. Pursuant to CPLR Section 1602, defendants are jointly and severally liable for all of plaintiffs' damages by virtue of respondeat superior.

## FACTUAL AND GENERAL ALLEGATIONS

50. Defendant JOSEPH GREY in or around the year 1985 or 1986, indicated on his application to become a police officer that he had a problem and/or illness with alcohol.

51. As a police officer with the 72nd Precinct since 1987, JOSEPH GREY engaged in multiple inappropriate and lawless episodes of excessive drinking at the 72nd Precinct while both on and off-duty further manifesting a problem with alcohol use.

52. From the time that he became a police officer until the day he was arrested for driving while drunk on August 4, 2001, defendant GREY was not asked once about his inappropriate and excessive use of alcohol, treated for his inappropriate and excessive use of alcohol, or disciplined for his inappropriate use of alcohol.

53. Rather, throughout defendant GREY's tenure as a police officer, he, along with other police officers of the 72nd Precinct, were explicitly and implicitly encouraged to inappropriately and excessively drink alcohol while on and off-duty.

54. This encouragement came from supervisory personnel, such as, defendant Sergeant KEITH SINGER and Sergeant DENNIS HEALY, and others, who, prior to August 4, 2001, routinely drank with defendant GREY and others in the 72nd Precinct parking lot, in violation of the laws of the State of New York.

55. In fact, as recently as two weeks prior to August 4, 2001, defendant GREY and defendant Sergeant KEITH SINGER were seen drinking alcohol while on-duty at the 72nd Precinct.

56. This type of behavior was condoned for all periods during GREY's tenure at the 72nd Precinct up to and including August 4, 2001.

57. At around 8:00 A.M. on Saturday, August 4, 2001, defendant Officer Grey, Sergeant Singer, Sergeant Healy, Officers Sills, Prisinzano, Gaudinoi, Desario, Alba, Chavez, and McGill began drinking alcoholic beverages in the police parking lot of the 72nd Precinct in Brooklyn, New York.

58. Many of the defendant-officers continued drinking in the 72nd Precinct until around 12:00 P.M. on August 4, 2001.

59. At that time, defendants GREY, CONWAY , WELSH, HILDEBRAND and SERGEANT HEALY left the parking lot, and drove to the defendant WILD WILD WEST, INC.'s d/b/a Wild-Wild-West bar and strip club.

60. Consistent with their lawlessness, this club had been placed off-limits to police officers and supervisory police officers of the 72nd Precinct prior to August 4, 2001.

61. The defendant-officers and Sergeant Healy who went to the off-limits bar on August 4, 2001, had ignored and violated the directive on multiple prior occasions and did so again on August 4, 2001.

62. While at the defendant WILD WILD WEST bar, the defendant officers GREY, WELSH, CONWAY, HILDEBRAND and SERGEANT HEALY continued to drink alcohol purchased from, and supplied by, employees and/or agents of the WILD WILD WEST, INC., d/b/a Wild-Wild-West.

63. At approximately 4:00 P.M. defendant GREY, while drunk, drove defendant HEALY back to the 72nd Precinct.

64. At approximately 4:45 P.M., defendant GREY went into the 72nd Precinct, while intoxicated, and interacted with police officers and supervisory officials who were inside the 72nd Precinct.

65. Shortly thereafter, at around 5:00 P.M. defendant GREY was allowed to leave the 72nd Precinct, get into his car, and drive while drunk back to defendant WILD WILD WEST, INC., d/b/a Wild-Wild-West.

66. Once defendant GREY arrived at the defendant WILD WILD WEST, INC., d/b/a Wild-Wild-West, defendant Wild-Wild-West, through its agents, servants and/or employees continued to serve an obviously intoxicated defendant GREY with even more alcohol.

67. At around 8:40 P.M., defendant GREY got into his car to drive back to the 72nd Precinct before he started his midnight shift tour-of-duty.

68. The car defendant GREY was driving, 1996 Ford Minivan, bearing New York License Plate Number X239DD, was owned by defendant GREY.

69. At about 9:00 P.M. on August 4, 2001, in a drunken condition, defendant JOSEPH GREY drove his minivan on Third Avenue in Brooklyn heading northbound.

70. As he approached 46th Street, he ran a red light, and, while traveling at an excessive rate of speed, struck DILCIA PENA, ANDY HERRERA and MARIA HERRERA, who was eight months pregnant with her son, RICARDO HERRERA

71. At the time of the collision, the innocent victims - - DILCIA PENA, MARIA HERRERA, RICARDO HERRERA and ANDY HERRERA - - were lawfully within the north crosswalk of the 46th Street as it crossed Third Avenue, crossing with the signal.

72. The collision between the car driven by intoxicated defendant GREY and the innocent victims, DILCIA PENA, MARIA HERRERA, ANDY HERRERA and RICARDO HERRERA, caused conscious pain and suffering and serious injury within the meaning of New York's Insurance Law §5102(d), and ultimately led to their deaths.

73. Plaintiff DILCIA PENA was a "covered person" as defined by Section 5102(j) of the Insurance law of the State of New York.

74. On May 3, 2002, as a result of defendant GREY's conduct of driving while intoxicated, driving recklessly and causing the deaths of DILCIA PENA, MARIA HERRERA, ANDY HERRERA and RICARDO HERRERA, defendant JOSEPH GREY was convicted of the criminal offenses of driving with a suspended license and manslaughter.

75. On May 23, 2002, defendant JOSEPH GREY was sentenced to an indeterminate prison term of five to fifteen years, the maximum term available by law.

76. Notwithstanding defendant GREY's ultimate conviction, shortly after the accident, various officers sued herein as "JOHN DOES" and "RICHARD ROES" engaged in conduct to cover up JOSEPH GREY'S guilt and deprive the plaintiff herein of her civil rights.

77. Under the oath of office, and the written rules and regulations promulgated by the NYPD, line officers and command personnel have an affirmative duty to intercede and prevent crimes and other misconduct committed by officers, and to report such conduct whenever they become aware of it.

78. According to Patrol Guide Interim Order 3, "[a]ll members of the service have an absolute duty to report . . . serious misconduct of which they become aware." Specifically, upon observing or becoming aware of corruption or misconduct or an allegation thereof, all police officers must, among other things, promptly telephone Internal Affairs and, within 24 hours, must provide Internal Affairs with a detailed written report setting forth what they know concerning other officers' misconduct. The Order, which was originally issued in January 1995, further provides that "[c]onduct designed to cover up acts of corruption, prevent or discourage its report or intimidate those who would report it will be charged as an obstruction of justice or other criminal act."

79. Defendant Police Officers, Supervisory Officials, and the PBA Officials made no effort to prevent or remediate the excessive use of alcohol by defendant GREY or his driving while intoxicated, and have made every effort - - continuing up to the present - - to conceal from authorities the truth about what actually occurred on August 4, 2001.

80. After defendant JOSEPH GREY revealed that he had an alcohol problem on his application to become a police officer, an effort to investigate the issue should have been made.

81. When it became apparent to the defendants that there was illegal drinking taking place in the 72nd Precinct parking lot, it should have been stopped.

82. Defendant Police Officer Grey was seen drinking while on duty before August 4, 2001, by other police officers and supervisors, and, as such, corrective action should have been taken.

83. Finally, on August 4, 2001, when in the presence of the above-named defendants who were witnesses to defendant GREY's drunken condition, action should have been taken by supervisors and others to prevent defendant GREY from driving a car.

84. As a direct and proximate result of this inaction and deliberate indifference, the defendants created a policy of permitting lawless behavior to exist and be tolerated by police officers relating to alcohol use and abuse.

85. Moreover, subsequent to the accident on August 4, 2001, defendant police officers of the Accident Investigation Squad deliberately attempted to cover up defendant GREY's guilt by: failing to investigate the crime scene properly, encouraging witnesses to falsely testify concerning the accident, intentionally destroying evidence, losing evidence, failing to document evidence or collecting evidence and falsifying reports in an effort to undermine the investigation into defendant GREY's involvement.

86. It is believed that defendant PBA quickly became involved in the conspiracy, and, through its agents, played a significant role in advancing the cover up. When defendant GREY came under suspicion, he, along with defendant Officer Finkelstein, met with union representatives defendant Gallo and defendant Immitt who are also police officers. Upon information and belief, the union's agents, including defendants Michael Immitt, Gallo and Williams Woes, conferred with the offending officer and officer Finkelstein, and received incriminating admissions of criminal behavior. Instead of coming forward and promptly reporting this information as they are obligated to do as police officers, the PBA and its police officer agents suppressed it, orchestrated an affirmative strategy of obstruction and falsification.

87. It was these defendants' intentions, upon information and belief, to devise a version of what had happened that would help to exonerate defendant GREY, and establish that he was not drunk or at fault for the accident.

88. Upon information and belief, one of the subjects discussed was a plan to claim that defendant GREY passed a sobriety test, and to falsely claim that the victims of the accident were to blame by darting out into traffic against the light. They also attempted to delay as long as possible the Court-ordered blood test of defendant GREY, and, in the interim helped sober up defendant GREY.

89. Moreover, defendant FINKELSTEIN contravened explicit directions from the King's County District Attorney's Office to bring defendant GREY's collected blood to the medical examiner's office. Instead, defendant FINKELSTEIN brought the collected blood to a non-authorized place with the hope and expectation that the sample would be lost.

90. The PBA agents' cover-up of wrongdoing in this case is the direct result of the union policies, customs, and practices of suppressing confessions and admissions of criminal conduct committed by police officers, of discouraging police officer witnesses from doing their duty, and of condoning and facilitating false statements to investigators.

91. Defendants CITY OF NEW YORK and PBA have worked together for years to encourage and maintain the "code of silence" and the "blue wall." One policy that encourages the "blue wall" is the rule allowing PBA officials to meet with and counsel officers who are under investigation.

92. One consequence of the custom of deliberate delay and avoidance, implemented only for police targets of investigation, is the window of opportunity for the destruction of evidence, the creation of cover stories, and the pressuring of witnesses. For instance in this case:

a. The photographs taken by AIS officers of the crime scene were unable to be used;

b. It is believed that potentially inculpatory evidence was removed from the scene and/or deliberately ignored;

c. Law enforcement personnel attempted to improperly influence witnesses in an effort to change their version of events;

d. Informal meetings, including the PBA-initiated gathering in the room where defendant GREY was to be tested for sobriety were convened for the purpose of preventing the truth about the wrongdoing from coming to light; and

e. Results of an alco-sensor test showing GREY's intoxication were intentionally suppressed.

93. The actions of all individual defendants were performed within the scope of their employment and authority, for whose acts the defendants CITY and PBA are liable under the doctrine of respondeat superior.

94. The actions of the defendant-officers violated plaintiff's clearly established rights under the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and were the direct and proximate cause of the wrongful death, civil rights violations, and pain and suffering.

95. The actions of all defendants were intentional, malicious, and in bad faith, thus giving rise to punitive damages as to all defendants with the exception of the municipality.

**DAMAGES**

96. As a direct and proximate result of the said acts of the defendants, plaintiff MARIA PENA individually and on behalf of the estate of DILCIA PENA sustained the following injuries and damages:

a. Violation of rights under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

b. Loss of life;

c. Pain and suffering, extreme fear of impending death, grief, loss of society, companionship, interruption of family relations;

d. Economic damages, including loss of income and support.

These harms occasioned by the defendants' actions continue to date, and upon information and belief, will continue into the future.

**COUNT I**

**42 U.S.C. § 1983 SUPERVISORY LIABILITY**

97. Paragraphs 1-96 are incorporated by reference as though fully set forth.

98. Defendants Captain Thomas Diprisco, Captain Roy Richter, Lieutenant Rick Karpen, Sergeant Peter Moy, Sergeant Michael Zarilli, Sergeant Keith Singer, Sergeant Dennis Healy, were at the relevant times, supervisory personnel at the 72nd Precinct or in the NYPD, with oversight responsibility for line officers JOSEPH GREY, CONWAY HILDEBRAND, WELSH, SILLS, PRINZANO , GAUDIO, DESARIO, ALBA, CHAVEZ, McGILL and JOHN DOES. They were responsible for the training, instruction, supervision, and discipline of the officers who drank to excess on 72nd Precinct grounds, drove while drunk, drank while on-duty and off-duty and frequented off-limits establishments.

99. It is believed that these defendants received complaints about the conduct of these and other officers in the 72nd Precinct, concerning past complaints, aberrant behavior, and disciplinary infractions, or, in the exercise of due diligence, would have perceived that these officers had conduct and disciplinary problems related to the use of alcohol that posed a pervasive and unreasonable risk of harm to the plaintiff.

100. These defendants knew, or in the exercise of due diligence should have known, that the conduct of these officers would allow for the actions against DILCIA PENA to likely occur.

101. It is believed that these defendants failed to take preventive and remedial measures to guard against illegal drinking in the 72nd Precinct parking lot, the drunken-driving, and attempted cover-up committed by GREY and others. Had they taken appropriate action, DILCIA PENA would not have been killed.

102. For example, the Police Department received a number of warnings and indications concerning defendant GREY's problem use of alcohol. Although the Police Department investigators never saw fit to inquire into the extent of the problem, GREY himself alerted the NYPD to it, defendant SINGER, Healy and others witnessed it first hand and never attempted to remedy the problem, discipline GREY, or otherwise protect the public from his dangerous proclivity of driving while intoxicated and working under the influence of alcohol.

103. The failure of these individual defendants to supervise and discipline GREY and the other officers of the 72nd Precinct amounted to gross negligence, deliberate indifference, or intentional misconduct, which directly caused the deprivations suffered by Ms. Pena and her daughter, DILCIA PENA's estate.

**COUNT II**

**42 U.S.C. §1983 - FIRST AND FOURTEENTH AMENDMENT VIOLATIONS**

104. Paragraphs 1-103 are incorporated by reference as though more fully set forth.

105. By their conduct and under color of law, all individuals and John Doe officers, and the PBA, acting under color of law, deprived Ms. Pena and the estate of DILICIA PENA of her First and Fourteenth Amendment rights to have access to and seek redress in the courts.

106. The defendants engaged in a cover-up in order to conceal the wrongful and unlawful conduct of defendant GREY.

107. The defendant's efforts to conceal the truth continue to the detriment of Ms. Pena.

108. As a direct and proximate result, Ms. Pena and the estate of DILCIA PENA suffered the injuries and damages described above.

**COUNT III**

**42 U.S.C.§ 1985(3) CONSPIRACY TO HINDER PROVISION OF EQUAL PROTECTION**

109. Paragraphs 1-108 are incorporated by reference as though fully set forth.

110. The individual defendants conspired with each other and with the PBA for the purpose of hindering and preventing the constituted authorities of the State of New York from securing and providing Ms. Pena individually and as administrator of the estate of DILCIA PENA equal protection of the laws.

111. In furtherance of the conspiracy, and to conceal the crimes and misconduct of defendant GREY, all the defendants, with the exception of the municipality, engaged in a cover up.

112. Among the actions taken in furtherance of the conspiracy to conceal were false statements made to investigators, a wholesale abdication of the officers' legal duty to report incriminating evidence to proper authorities - - a default encouraged by defendant PBA - - attempting to improperly influence witnesses to the crime to provide false information destroying and or ignoring pertinent evidence of defendant GREY's guilt, and directly and indirectly discouraging Ms. Pena individually and as administrator for the estate of DILCIA PENA from seeking access to and redress in the Courts.

113. As a proximate and direct result of defendants' conduct, Ms. Pena individually and in her representative capacity suffered the injuries and damages described above.

**COUNTY IV**

**42 U.S.C. §1985(2) CONSPIRACY TO IMPEDE DUE COURSE OF JUSTICE**

114. Paragraphs 1-113 are incorporated by reference as though fully set forth.

115. Each of the individual defendants conspired, along with the PBA, to impede the due course of Justice in New York State with the intent of denying Ms. Pena the equal protection of the laws.

116. As a proximate and direct result of the defendants' conduct, Ms. Pena suffered the injuries and damages described above.

**COUNT V**

**42 U.S.C. §1983 - FAILURE TO INTERCEDE**

117. Paragraphs 1-116 are incorporated by reference as though fully set forth.

118. By their conduct and under color of state law, it is believed defendants SERGEANT PETER MOY, SERGEANT MICHAEL ZARILLI, POLICE OFFICER JACK CONWAY, POLICE OFFICER JOHN WELSH, POLICE OFFICER EDWARD SILLS, POLICE OFFICER ANTHONY PRINZANO, POLICE OFFICER MICHAEL GAUDIO, POLICE OFFICER MARIE DESARIO, POLICE OFFICER PAUL ALBA, POLICE OFFICER JOHN CHAVEZ, POLICE OFFICER MICHAEL McGILL, "JOHN DOES", and "RICHARD ROES" each had opportunities to intercede on behalf of Ms. Pena to prevent the drunken driving of defendant GREY, but, due to their intentional conduct or deliberate indifference, declined or refused to do so.

119. As a direct and proximate result, MARIA PENA and the estate of DILCIA PENA suffered the injuries and damages described above.

**COUNT VI**

**42 U.S.C. §1983 - SYSTEMIC CLAIM AGAINST CITY AND PBA**

120. Paragraphs 1-119 are incorporated by reference as though fully set forth herein.

121. Prior to August 4, 2001, the City, acting at the behest of and in close conjunction with the PBA, has developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violation of Ms. Pena's rights.

122. It was the policy and/or custom of the City to investigate inadequately and improperly complaints of police misconduct and to punish inadequately those complaints which were substantiated. Instead, acts of alcohol induced misconduct have been tolerated by the City. The Internal Affairs Bureau (IAB) and the Civilian Complaint Review Board (CCRB) have substantially failed in their responsibilities to investigate misconduct and discipline transgressors. Since the CCRB became independent in 1993, through December 1996 it received numerous complaints, yet the NYPD dismissed only one officer as a result of a CCRB investigation.

123. IAB investigations of alcohol induced misconduct rarely lead to administrative trials and, in the rare instances that charges are sustained administratively, the punishment is minimal, lacking any deterrent effect. Since there is no disciplinary sanction available between thirty days' suspension and dismissal, and dismissal is almost always deemed too harsh , even the most brazen acts of alcohol induced misconduct, short of death are resolved with a slap on the wrist.

124. The City has been on notice for more than a generation that alcohol abuse is widespread and that particular reforms need to be implemented. Recognizing the flawed policy of dealing with alcohol problems, now, after JOSEPH GREY's case has come to light,

Commissioner Raymond Kelly has vowed to implement a new no-tolerance policy relating to alcohol induced misconduct by NYPD officers. This has become necessary because many supervisors share the perception that nothing is really wrong with a bit of alcohol overindulgence and because they believe that this is a right of passage into the brotherhood of police.

125. It was the policy and/or custom to supervise and discipline officers inadequately, including the defendant officers, thereby failing to discourage constitutional violations on the part of its police officers.

126. It was and is the policy of the City to give police officers suspected of alcohol related violations special concessions not extended to the public. This double standard has led to the concealment of evidence of alcohol related misconduct, supression of such evidence and other cover-ups.

127. Part of this double standard requires that when the target officer is notified, a PBA representative must be present. The PBA representatives, who are almost always members of the NYPD, hear confessions and admissions of misconduct and then conceal them from the Department, a practice condoned by the Department even though its rules and regulations purport to prohibit it. Additionally, PBA representatives utilize this opportunity to assist target officers in conspiring to cover up their crimes and misconduct and thus avoid detection and punishment.

128. Although this requirement is supposed to apply only to administrative investigations, it is the City's custom to follow the rule in criminal investigations, as well. Moreover, while the rule is expressly limited to targets - with mere witnesses accorded a four-hour grace period - the custom, is to allow the PBA and its representatives considerable input in deciding who is a target and who is a witness.

129. These policies operate to insulate police officers who engage in criminal or other serious official misconduct from detection, prosecution, and punishment, and are

maintained with deliberate indifference to that obvious and widely known effect.

130. Police officers of the City of New York have for years engaged in a pattern and practice of actively and passively covering up the misconduct of fellow officers by failing to come forward or failing to accurately give evidence as to misconduct of which they are aware, thereby establishing and perpetuating a "code of silence."

131. This "code of silence" is a custom so deeply ingrained in the New York City Police Department so as to constitute the policy of the City of New York.

132. The City has been deliberately indifferent to the need for more or different training, rules and regulations relating to police officers who witness or have information regarding misconduct by fellow officers. The City has failed to properly sanction or discipline officers who are aware of and subsequently conceal and/or aid and abet violations of constitutional rights of citizens by other New York City police officers, thereby causing and encouraging New York City police officers, including the individual defendants in this case, to violate the rights of citizens such as MS. Pena and her daughters Dilcia and Maria and grandchildren Andy and Ricardo.

134. Once again, the City was on notice about this problem for years and it had been an important area of focus for the Mollen Commission, which specifically found that the tactics of the PBA and other unions "put[] immense pressure on the guiltless officer - who may want to answer questions - not to stray from the common practice of abiding by union advice and remaining silent"; that "PBA delegates and attorneys help reinforce the code of silence.

135. It is believed the City has maintained no system or an inadequate system of review of officers, withhold knowledge or give false information regarding misconduct by fellow officers. This failure to identify and track such officers, including the defendant officers, or to discipline, more closely supervise, or retrain such officers who engage in the "code of silence,"

causes New York City police officers to believe that they can engage in misconduct, secure in the knowledge that their fellow officers will neither intervene nor give evidence against them. These systemic deficiencies include, but are limited to:

a. Preparation of investigative reports designed to vindicate the conduct of officer who gave false information about the misconduct of other officers, or who falsely denied knowledge about misconduct which they were in a position to observe;

b. Preparation of investigative reports which uncritically rely solely on the word of police officers and which systematically fail to credit testimony of non-police witnesses.

c. Preparation of investigative reports which omit or ignore factual information and physical evidence which contradict the accounts of police officers;

d. Issuance of public statements exonerating officers involved in such incidents prior to the completion of investigation;

e. Failure to have meaningful review of investigative reports by responsible superior officers for accuracy or completeness, including consideration of the conduct of officers who were not actively engaged in the misconduct which was the subject of the investigation, and acceptance of conclusions which are not supported by the evidence or which contradict such evidence; and

f. Failure to identify potential "code of silence" violations and maintain accurate records fo allegations of such misconduct.

136. The City, prior to and at the time of this incident, was aware of the need for more or different training, rules, regulations, investigations and discipline relating to police officers who practice the "code of silence," and was deliberately indifferent to that need.

137. The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the danger of harm to citizens such as plaintiff and the need for more or different training and discipline are policies, practices and customs of the City of New York and have caused police officers, including the officer defendants in this case, to believe that they can violate the laws of the State of New York, Federal laws and the rights of citizens with impunity, and that their fellow officers would conceal such conduct, including swearing falsely and committing perjury, all with the foreseeable result that officers will violate the constitutional rights of citizens.

138. The culture of silence and dishonesty concerning police misconduct exists because of, rather than despite, the efforts of the PBA.

139. As the Mollen Commission found, the PBA's policies put "immense pressure" on honest officers to maintain silence - to the detriment of law enforcement and police-community relations - and often contrary to these individuals' own interest and "fuel the insularity that characterizes police culture." The Commission accused PBA delegates of trying to thwart law enforcement efforts to eradicate widespread police corruption.

140. The role the PBA and its agents played in this case was not an aberration. Rather, it has been standard operating procedure to abet and orchestrate the obstruction of justice in even the most notorious instances of police misconduct.

141. This conspiracy between the City and PBA is ultimately responsible for, and the proximate and direct cause of the violation of Ms. Pena's rights and the extraordinary injuries that ensued.

## COUNT VII

### PENDENT CLAIM OF GROSS NEGLIGENCE AND NEGLIGENCE

142. Paragraphs 1-141 are incorporated by reference as fully set forth.

143. Defendant PBA has been grossly negligent and negligent in the supervision, training, and monitoring of its representatives who consult with and counsel police officers who are suspected of crimes and misconduct, and police officers who are witnesses to crimes and misconduct by their fellow officers.

144. By virtue of the unique public safety considerations implicated by police violence, its pivotal role in the official investigation of police misconduct, and its express undertakings in its collective bargaining agreement with the City, the PBA has a duty to make sure its members and its agents, who are also police officers, do not violate their duties as police officers to report crimes and misconduct by fellow officers.

145. The PBA has been grossly negligent and negligent in the instruction and training it provides to its members with respect to their responsibilities to report crimes or misconduct by other police officers.

146. The PBA has been on notice for many years that its representatives have played a role in the improper obstruction of criminal investigations of New York City police officers.

147. The PBA knew or should have known that its policies and practices have contributed to improper concealment of admissions by police officers to PBA representatives, and a "code of silence" being followed by police officers, who are also PBA members, to cover up crimes and misconduct.

148. The PBA knew or should have known that its policies and practices, as well as its grossly negligent and negligent supervision and training of PBA representatives, created an

atmosphere where the most violent police officers felt assured that their most brazen acts of misconduct would not be swiftly and effectively investigated and prosecuted.

149. The egregious conduct of defendant GREY previously set forth, and the subsequent cover up of those events, were reasonably foreseeable results of the PBA's negligent conduct.

**COUNT VIII**

**PENDENT CLAIM OF NEGLIGENT AND RECKLESS OPERATION OF A MOTOR VEHICLE**

150. Paragraphs 1-149 are incorporated by reference as though fully set forth.

151. By his actions, set forth above, defendant GREY negligently and recklessly violated New York State Law by driving while drunk, failing to stop at a red traffic signal, failing to yield to pedestrians having the right of way, driving at an excessive speed, failing to sound his horn among other legal violations.

152. For this conduct defendant GREY was convicted of four counts of manslaughter and sentenced to a five to fifteen years prison term.

153. As a result, defendant GREY was a cause of the wrongful death of DILCIA PENA, MARIA HERRERA, ANDY HERRERA and RICARDO HERRERA.

154. Defendant GREY's grossly negligent actions rise to the level necessitating the imposition of both actual and punitive damages for the harm caused.

**COUNT IX**

**PENDENT CLAIM - RESPONDEAT SUPERIOR**

155. Paragraphs 1-154 are incorporated by reference as though fully set forth.

156. At all relevant times, all defendant employees of the City of New York were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

157. Consequently, the City is liable under the doctrine of *respondeat superior* for their tortious actions.

**COUNT X**

**42 U.S.C. § 1983 AND PENDENT CLAIM BY MARIA PENA**

158. Paragraphs 1-157 are incorporated by reference as though fully set forth.

159. At all times relevant tot his action, MARIA PENA was the mother and natural guardian of DILCIA PENA, the mother of MARIA HERRERA, the grandmother of ANDY HERRERA and the grandmother of RICARDO HERRERA. As such, Ms. Pena was entitled to the comfort, enjoyment, society, companionship, familial association and services of her children and grandchildren, which are guaranteed to plaintiff under the laws of the United States, 42 U.S.C. § 1988. Moreover, defendants' conduct undermined MARIA PENA's liberty interest in preserving the mother daughter relationship from intervention by the State without due process of law.

**COUNT XI**

**PENDANT CLAIM OF TAVERN OWNER LIABILITY**

160. Paragraphs 1-159 are incorporated by reference as though fully set forth.

161. On August 4, 2001, the defendant WILD WILD WEST, INC. d/b/a WILD-WILD-WEST, contributed to the intoxication of defendant GREY in violation of the Laws of the State of New York, including Sections 11-100 and 11-101 (The Dram Shop Act), by unlawfully selling, delivering, providing or giving him intoxicating liquors and/or alcoholic beverages, although the said defendant, its agents servants and/or employees knew or could and should have

ascertained by observation that defendant GREY was then and there under the influence of liquor and was visibly and apparently intoxicated, rowdy, belligerent and dangerous.

162. As a result, defendant WILD WILD WEST, INC. d/b/a WILD-WILD-WEST, by virtue of the theory of respondeat superior was in part responsible for allowing defendant GREY to drive while in an inebriated condition and therefore was a proximate cause of plaintiff, DILCIA PENA's wrongful death.

WHEREFORE, plaintiff requests the following relief jointly and severally as against all of the defendants:

1. Award compensatory damages of $100,000,000.00 and/or an amount to be determined at trial; such amount being in excess of the jurisdictional limits of this Court;
2. Award punitive damages of $100,000,000.00 and/or an amount to be determined at trial; such amount being in excess of the jurisdictional limits of this Court;
3. Award equitable relief against the PBA;
4. Disbursements, costs, and attorneys' fees; and
5. For such other and further relief as to this Court may seem just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated: New York, New York
May 29, 2002

Respectfully submitted,

By: Derek Sells

DEREK S. SELLS (8891)
THE COCHRAN FIRM, SCHNEIDER, KLEINICK,
WEITZ & DAMASHEK
Attorneys for Plaintiff
233 Broadway
New York, New York 10279
(212) 553-9000